# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

**CIVIL ACTION NO: 4:18-CR-00015-JHM**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**V.**

**CHARLEY BARBER**
**GLENDAL "BUDDY" HARDISON**
**BRIAN KEITH CASEBIER**
**STEVE DEMOSS**
**BILLIE HERALD**
**RON IVY**
**JOHN ELLIS SCOTT**
**DWIGHT FULERSON**
**JEREMY HACKNEY**                                              **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Joint Motion to Strike Portions of the Indictment and Motion in Limine. [DN 102]. The Court held a hearing on the Motion on October 3, 2019. Fully briefed, this matter is ripe for decision.

## I.     BACKGROUND

Defendants, agents of Armstrong Coal Company, are charged with conspiracy to defraud the United States. 18 U.S.C. § 371. The basis for the Indictment is the allegation that Defendants "conspired to commit dust fraud by knowingly and willfully altering the company's required dust-sampling procedures, by circumventing the dust-sampling regulations, submitting false samples, and by making false statements on dust certification records." [DN 1 ¶ 1].

On August 1, 2019, Defendants submitted a Joint Motion to Strike Portions of the Indictment and in Limine. [DN 102]. Defendants first move the Court to strike from paragraphs 1, 4, 5, and 6 of the Indictment "allegations that respirable coal mine dust causes lung disease, that

respirable coal mine dust causes pneumoconiosis and silicosis, that federal regulations were enacted to reduce levels of respirable coal mine dust, and that reducing levels of respirable coal mine dust is the only way to prevent such diseases." [DN 102-1 at 1]. Defendants argue that the only charge in the Indictment—18 U.S.C. § 371—concerns conspiracy to commit an offense or to defraud the United States and that the cited information in those paragraphs is irrelevant to the charge. [DN 102-1 at 2–2]. The Government responds that the information contained in those paragraphs is "at the heart of this case" and should not be stricken. [DN 106 at 1].

Defendants also move the Court to issue an Order prohibiting the Government from referencing at trial any information contained in the above-mentioned paragraphs. [DN 102; DN 102-1 at 3–5]. Defendants argue that such evidence is not relevant, but that even if the Court finds that the evidence is relevant, its probative value is outweighed by unfair prejudice. [DN 102-1 at 3–5]. The Government objects to this request and argues that the evidence is relevant to Defendants' motive and that there is nothing about the information that is *unduly* prejudicial to Defendants. [DN 106 at 4–5].

## II. DISCUSSION

Federal Rule of Criminal Procedure 7(c)(1) requires an indictment to "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." If an indictment does not satisfy the confines of Rule 7, a court "[u]pon the defendant's motion . . . may strike surplusage from the indictment." FED. R. CRIM. P. 7(d); *see also United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974) ("Rule 7(d) . . . makes the striking of surplusage permissive but not mandatory."). The Sixth Circuit has said that "[t]he Rule is properly invoked when an indictment contains nonessential allegations that could prejudicially impress the jurors." *Kemper*, 503 F.2d at 329. "[I]f the language in the indictment is information which the government hopes

to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *United States v. Thomas*, 875 F.2d 559, 562 n.2 (6th Cir.) (citation omitted), *cert denied*, 493 U.S. 867 (1989). Accordingly, any information stricken from the indictment must also be deemed not legally relevant for purposes of trial.

The Government cites to several cases as support for its contention that it is entitled to present, both in the Indictment and to the jury, the basic purpose of the regulations under which the defendants are accused. Indeed, several cases in the Sixth Circuit have addressed motions to strike "background" information contained in indictments. The consensus of that line of cases is that language ought not be stricken from an indictment where the information helps to make sense of or explain the context for the criminal charge. *See United States v. Huddleston*, No. 3:16-CR-61, 2017 WL 3332757, at *7 (E.D. Tenn. Aug. 3, 2017) ("[T]he United States' use of background information in an indictment is not surplusage when . . . it helps to make sense of or establish context for the criminal charges."); *United States v. Daughtery*, No. 5:16-CR-22, 2017 WL 781048, at *2 (E.D. Ky. Feb. 28, 2017) ("[T]he Court should not strike phrases—included in the Indictment's background section—because they indeed help explain the context and circumstances surrounding the charged fraud in order for the charges to be understood.") (internal quotation marks and citation omitted); *United States v. Garton*, No. 3:08-CR-31, 2009 WL 1424429, at *3 (E.D. Ky. May 21, 2009) (same).

The Court concludes that some of the language that Defendants find objectionable should not be stricken because it provides necessary context to the charges in the indictment. Therefore, certain language concerning the statutory scheme and purposes of the health and safety standards will remain. However, language specifically mentioning black lung and the disease process is not relevant and serves no purpose other than to inflame the jury. It will be stricken.

The Government argues that evidence of disease is relevant since it will be seeking a sentencing enhancement under § 5K2 of the Sentencing Guidelines. This evidence may be relevant at a sentencing hearing but it will not be allowed at the trial of this case. The attached document reflects the Court's judgment as to which language should remain in the indictment and which should be stricken. The scope of evidence permitted at trial must fall within the confines of the information remaining in those paragraphs.

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Joint Motion to Strike and in Limine [DN 102] is **GRANTED in part and DENIED in part**.

Joseph H. McKinley Jr., Senior Judge
United States District Court

November 1, 2019

cc:     counsel of record

4

<u>INTRODUCTION</u>

At times relevant to this Indictment:

1. Beginning no later than January 1, 2013, and continuing through August 8, 2015, the defendants, **CHARLEY BARBER, BRIAN KEITH CASEBIER, STEVEN DEMOSS, BILLIE HEARLD, RON IVY, JOHN ELLIS SCOTT, DWIGHT FULKERSON,** and **JEREMY HACKNEY,** all defendants herein, and agents of Armstrong Coal Company, an unindicted co-conspirator, conspired to commit dust fraud by knowingly and willfully altering the company's required dust-sampling procedures, by circumventing the dust-sampling regulations, submitting false samples, and by making false statements on dust certification cards. The dust sampling procedures are mandatory health and safety standards designed to protect the nation's miners from ~~the scourges of pneumoconiosis, commonly known as "black lung," and silicosis the most common coal mine dust-caused diseases.~~ Chronic exposure to respirable coal mine dust ~~causes lung diseases that can lead to permanent disability and death~~. By circumventing the dust sampling procedures, Armstrong Coal and its co-conspirators, avoided implementing ventilation and production controls that might cost money or lower production, and thus were able to save money at the expense of exposing the miners employed at the Parkway and Kronos mines to the risks of breathing air with elevated levels of respirable coal dust~~, increasing their risks of contracting black lung~~.

. . .

4. In order to protect the ~~mining industry's "most precious resource - the~~ miner,~~"~~ Congress passed the Federal Mine Safety and Health Act of 1977, as augmented by the MINER Act of 2006 (hereinafter the Mine Act). A stated purpose of the Mine Act is to provide working conditions in underground coal mines sufficiently free of respirable dust concentrations ~~so as to permit each miner the opportunity to work underground during the period of his or her entire adult life without incurring any disability from black lung and silicosis~~.

5. ~~Black lung is an occupational lung disease typically not incurred by the general population. When coal dust particles enter the lungs, they irritate the delicate lung tissue and eventually form massive impenetrable fibrous tissue that significantly restricts the lung's functions and causes scarring, which can lead to lung failure and death. Once black lung develops, it cannot be reversed. Black lung is preventable, yet from 2005-2014 over 4,800 of the nation's miners died from black lung.~~ Lowering the concentration of respirable coal mine dust in the air that miners breathe is the only means of preventing diseases caused by excessive exposure to such dust. ~~There are no specific treatments to cure black lung. The chronic effects of black lung may progress even after the miners are no longer exposed to respirable coal dust resulting in increasing disability and death.~~ Major sources of dust generation in continuous mining operations are continuous mining machines, shuttle cars and roof bolters. Major control methods for dust in mining operations are water and ventilation control systems.

6. The Mine Act ordered the Secretary of Labor, acting through an agency of the United States Department of Labor; that is, the Mine Safety and Health Administration (hereinafter MSHA), to develop "mandatory health and safety standards for the protection of life and prevention of injuries in coal and other mines" which, subsequent to commentary and review, became law and to which each operator and its agents must adhere. Title 30, United States Code, Sections 801 and 811. These standards include requirements to monitor the mine atmosphere and take and record dust-samples as well as creating and maintaining records. These dust regulations improve the health protections for coal miners by reducing their occupational exposure to respirable coal mine dust and by lowering the risk they will suffer material impairment of health or functional capacity over their working lives.